1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MINDY LOSEE, individually and as              No.  2:14-cv-02199-KJM-CMK
     successor in interest to Breanne Sharpe,
12   deceased,

13                  Plaintiff,                      ORDER

14          v.

15   CITY OF CHICO; SCOTT ZUSCHIN;
     DAMON SELLAND; NICK VEGA;
16   JARED CUMBER; and DAVID
     QUIGLEY,
17
                    Defendants.
18

19

20          In the early morning hours of September 22, 2013, what started as a routine traffic

21   stop for a broken taillight escalated to a 1.6 mile police chase of Breanne Sharpe by at least five

22   police officers in a residential neighborhood in Chico, California.  In the end, Ms. Sharpe died,

23   and her mother, Mindy Losee, filed this suit against the officers and the City of Chico.  Ms. Losee

24   contends the officers' use of force was unreasonable and violated federal constitutional and state

25   law.  Following discovery, the officers moved for summary judgment, contending their force was

26   justified by the threat Ms. Sharpe posed to them and the public.  At hearing on the motion, Renee

27   Valentine appeared for plaintiff and Sharon Medellin appeared for defendants.  ECF No. 39.  For

28   /////

                                                   1

1   reasons explained below, the court having carefully considered and weighed the evidence in this

2   difficult case, defendants' motion is GRANTED.

3   I.      PROCEDURAL HISTORY

4           A year after the police chase, Ms. Losee filed suit against the City of Chico,

5   officers Zuschin, Selland, Vega, Cumber, and Quigley, and several Doe defendants.  Compl.,

6   ECF No. 1.  The court dismisses Doe defendants because Ms. Losee has not identified or served

7   them, *Craig v. United States*, 413 F.2d 854, 856 (9th Cir. 1969) (the court may dismiss the Doe

8   defendants sua sponte).

9           Ms. Losee's complaint makes eleven claims: (1) unreasonable search and

10  seizure—detention and arrest in violation of the Fourth Amendment; (2) unreasonable search and

11  seizure—excessive force in violation of the Fourth Amendment; (3) denial of medical care in

12  violation of the Fourth Amendment; (4) interference with familial relationship in violation of the

13  substantive due process clause of the Fourteenth Amendment; (5) municipal liability under

14  § 1983 for approving the acts of the defendant officers; (6) municipal liability under § 1983 for

15  failure to train; (7) municipal liability under § 1983 for an unconstitutional custom or policy;

16  (8) false arrest or false imprisonment in violation of California Government Code section

17  815.2(a); (9) battery in violation of California Government Code section 815.2(a);

18  (10) negligence in violation of California Government Code section 815.2(a); and (11) violation

19  of California Civil Code § 52.1, or the Bane Act.  Compl.  Claims one through four are against

20  the officers, *id.* ¶¶ 29–54, five through seven against the City and doe defendants, *id.* ¶¶ 55–85,

21  eight and nine against the City and the officers, *id.* ¶¶ 86–99, and ten and eleven against all

22  defendants, *id.* ¶¶ 100–117.

23          The officers move for summary judgment of all claims and in the alternative for

24  partial summary judgment on some claims.  Mot., ECF No. 17.  Ms. Losee has agreed to

25  voluntarily dismiss six of her claims, numbered according to the number assigned the claim in the

26  complaint: (1) unreasonable search and seizure—detention and arrest; (3) denial of medical care;

27  (5) municipal liability for approving the acts of defendant officers;

28

2

1    (6) municipal liability for failure to train; (7) municipal liability for an unconstitutional custom or

2    policy; and (8) false arrest or false imprisonment in violation of California Government Code

3    section 815.2(a).  *See generally* ECF No. 21.  The officers do not oppose dismissal.  The court

4    dismisses these claims under Federal Rule of Civil Procedure 41(a)(2), with five claims

5    remaining: (2) unreasonable search and seizure—excessive force in violation of the Fourth

6    Amendment; (4) interference with familial relationship; (9) state law battery (10) state law

7    negligence; and (11) violation of the Bane Act.  Opp'n, ECF No. 20.  Ms. Losee nonetheless

8    opposes summary judgment on these remaining claims, *id.*, and the officers have replied, Reply,

9    ECF No. 26.

10   II.      FACTUAL BACKGROUND

11            The following facts are undisputed unless otherwise stated.  Where a genuine

12   dispute exists, the court draws reasonable inferences in favor of Ms. Losee.  *Tolan v. Cotton*,

13   ___U.S.___, 134 S. Ct. 1861, 1868 (2014).

14            The officers have proffered a computer-based video reenactment prepared by the

15   officer involved shooting incident protocol team and obtained from the Chico City files.

16   Medellin Decl. 2, ECF No. 17-1; Defs.' Ex. 2, ECF No. 17-2.  Ms. Losee objects to the computer

17   reenactment, contending it lacks foundation and is contrary to the officers' testimony at

18   deposition.  ECF No. 21.  The court sustains Ms. Losee's objections and does not consider the

19   video, with one exception.  The map displayed at the beginning of the reenactment shows the

20   undisputed relationship of the primary streets in the neighborhood where the chase occurred.  The

21   court references the map, reproduced below, for the limited purpose of contextualizing the

22   locational and geographical facts surrounding the chase.

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1

2

3

4

5

6

7

8

9

10

11

12

13



14

15

Defs.' Ex. 2.

16    A.    Officer Marshall First to Respond

17          At approximately 1:56 a.m. on September 22, 2013, the Chico Police Department

18    received a call from a citizen at 842 Coit Tower Way, northeast of Vista Verde Avenue and off

19    the map reproduced above, reporting a suspicious person checking car door handles.  Undisputed

20    Material Fact (UMF) No. 1, ECF No. 21.[1]  Officer Ed Marshall was the first to respond, arriving

21    in full uniform and a marked police car to perform an area check.  UMF No. 2.  When he arrived,

22          _____

23          [1] Ms. Losee objects to this fact, as well as to UMF Nos. 3, 9, 14, 25, 26, 27, 29, 32, 33, 49,
      66, 75, 76, 78, and 80 on grounds of relevancy.  ECF No. 21.  Ms. Losee objects to UMF Nos. 21,
      23, 26, and 31 on grounds of speculation.  *Id.*  Ms. Losee objects to UMF Nos. 26, 29, 31, 34, 39,

24    42, 53, and 76 on grounds of vagueness or ambiguity.  *Id.*  Ms. Losee objects to ECF Nos. 21, 26,
      and 53 on grounds of "compound."  All objections are overruled for purposes of this order.

25    Relevancy and speculation objections are redundant; the court cannot rely on irrelevant or
      speculative evidence.  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal.

26    2006).  As to vagueness objections, the court finds no vagueness in the statements objected to.

27    As for "compound" facts, Ms. Losee makes this objection without explanation.

28

                                        4

Officer Marshall observed a black Honda Del Sol with a broken taillight traveling north on Coit Tower Way.  UMF No. 3.  Officer Marshall blinked his emergency lights in the Honda's direction as his attempt to initiate a traffic stop because of the broken taillight.  UMF Nos. 3, 9, Marshall Decl. ¶ 7, ECF No. 17-17.  The Honda did not stop, and instead turned onto and drove west on East Eighth Street, a narrow residential street with speedbumps, at fifty miles per hour.  Marshall Decl. ¶ 7.

The Honda then turned south onto Vista Verde Avenue, the location of a large apartment complex with a parking lot containing speedbumps.  UMF Nos. 10, 11.  While the officers contend the Honda, whose driver was later identified as Ms. Sharpe, drove east on Vista Verde Avenue at forty miles per hour, Marshall Decl. ¶ 9, Ms. Losee cites evidence suggesting Ms. Sharpe was driving fifteen miles per hour, Cumber Dep. 18:14–17.  As Officer Marshall followed Ms. Sharpe down Vista Verde, Ms. Sharpe did not slow down for speedbumps and stop signs, and drove on the wrong side of the road.  UMF Nos. 9,11.  The chase halted momentarily when Ms. Sharpe ran into a six-inch red curb, and Officer Marshall pulled up behind her in an attempt to make contact.  UMF Nos. 14, 15.  As he pulled up, Ms. Sharpe backed up, turned around and started driving west on Vista Verde Avenue; Officer Marshall followed.  UMF No. 15.  Ms. Sharpe then returned to East Eighth Street, turning right, and started driving east.

B.     Sergeant Zuschin Responds to Dispatch Reports

Meanwhile, Sergeant Scott Zuschin was inside his office at the Chico Police Department when he heard the dispatch call from a loudspeaker referring to a "suspicious circumstance."  Zuschin Dep. 20:15–17.  Within ten minutes of the initial call, Sergeant Zuschin heard dispatch say Ms. Sharpe was fleeing from Officer Marshall.  At this point, Sergeant Zuschin testified he engaged in a thought process, considering issues such as "who was involved in the pursuit, where the pursuit was located and heading to, and any dangers or risks that might be involved in letting the pursuit continue."  Zuschin Dep. 23:11–14.  Considering these issues, along with Officer Marshall's reputation as an "experienced officer," Sergeant Zuschin allowed Officer Marshall time to obtain control of the situation.  Zuschin Dep. 24:18–20.  At "some point" later, Sergeant Zuschin drove to the area of the chase.  *Id.* 20:7–8, 25:6–7.

1          When Sergeant Zuschin arrived at the corner of East Eighth Street and Vista Verde

2     Avenue, he heard Officer Marshall report over dispatch that Ms. Sharpe was turning into the

3     apartment complex parking lot on Vista Verde.  UMF No. 19.  Suspecting Ms. Sharpe might have

4     stopped and run away on foot through the apartment complex, Sergeant Zuschin positioned his

5     car on East Eighth Street near the entrance of Vista Verde Avenue.  UMF No. 20.  Sergeant

6     Zuschin then exited his patrol car and began to move to its rear when he saw Ms. Sharpe drive

7     from Vista Verde Avenue onto East Eighth Street so quickly that the Honda "looked like it was

8     airborne" as it came around the turn.  UMF No. 21.  Ms. Sharpe then drove across both lanes of

9     East Eighth Street and onto the curb on the north side of the street.  UMF No. 22.

10          After hitting the curb, Ms. Sharpe swerved back into the roadway and drove

11    diagonally across the street towards Sergeant Zuschin, who at this time was located near the bike

12    path along the shoulder of the roadway on the south side of East Eighth Street.  UMF No. 23;

13    Zuschin Dep. 34:20–22; 37:23–24.  At this point, it is unclear whether Sergeant Zuschin was

14    behind the back bumper of his patrol car or by the back passenger door as Ms. Sharpe drove

15    toward him.  *See* Zuschin Dep. 34:7–25.  In any event, it is undisputed that Sergeant Zuschin was

16    near the back of his car.  UMF No. 21, 23.  As Ms. Sharpe's car approached him, Sergeant

17    Zuschin un-holstered his gun and hopped from side to side as he tried to anticipate which way

18    Ms. Sharpe would travel next.  UMF No. 25.  Ms. Sharpe adjusted her direction, drove past

19    Sergeant Zuschin's car, hit the curb on the south side of the roadway, drove onto the sidewalk,

20    and hit a utility pole.  UMF No. 26.

21          Concerned that Ms. Sharpe was seriously injured, or that she would attempt to flee

22    on foot, Sergeant Zuschin approached the Honda from behind.  UMF No. 27.  As he came within

23    fifteen to twenty feet of the Honda, Sergeant Zuschin saw the white back-up lights come on, and

24    the Honda starting to move backwards.  Plaintiff's Undisputed Material Facts (PUMF) No. 110,

25    ECF No. 21; Zuschin Dep. 46:9–10.  The parties dispute whether Ms. Sharpe rapidly accelerated

26    directly toward Sergeant Zuschin and whether at this point Sergeant Zuschin thought Ms. Sharpe

27    was going to run him over.  *Compare* Zuschin Interview 11:19–24 *to* Zuschin Dep. 48:14–16.

28    The officers cite evidence suggesting Sergeant Zuschin thought he was going to be run over.

6

1    Zuschin Interview 11:19–24.  Ms. Losee points out that Sergeant Zuschin testified he did not

2    know how fast Ms. Sharpe was going when the Honda began to back up, or whether Ms. Sharpe

3    was trying to hit him.  Zuschin Dep. 48:14–16.

4            Sergeant Zuschin fired two shots at Ms. Sharpe through the rear window of

5    Ms. Sharpe's car as she backed up toward him.  PUMF 117.  He estimates between ten and fifteen

6    seconds elapsed after the Honda's reverse lights came on and before he fired his first shot.

7    PUMF No. 111.  After both shots, Ms. Sharpe placed the Honda in drive, made a U-turn, and

8    headed west down East Eighth Street.  UMF No. 31.

9            Sergeant Zuschin testified that as Ms. Sharpe drove away, he scanned the direction

10   Ms. Sharpe was moving and realized she posed "a threat to public safety and officers at the

11   scene."  Zuschin Dep. 54:24–55:1.  As a result, he fired two more shots toward the moving car.

12   UMF No. 33.  Plaintiff's expert Scott Defoe challenges Sergeant Zuschin's reason for shooting,

13   pointing out that Sergeant Zuschin shot in the very direction he believed officers and the public

14   might be.  DeFoe Dep. 58:25–59:6.

15           C.      Officer Selland Joins the Call

16           Officer Selland was also in his office at the Chico Police Department when he

17   heard the dispatch call.  UMF No. 34; Selland Interview 9:13–15.  He responded to Coit Tower

18   Way, drove onto East Eighth Street, and parked behind Sergeant Zuschin's car but closer to the

19   north side of the street and next to a small tree on his left.  UMF Nos. 34, 36; Selland Interview

20   11:10–12.  Officer Selland exited his car and positioned himself between his car's open driver's

21   door and the front left quarter panel.  UMF No. 37. As he exited, Officer Selland heard gunshots

22   but he did not know who was firing those shots or where the shots were coming from.  Selland

23   Dep. 11:3–6.

24           Officer Selland's arrival coincided with Ms. Sharpe's crashing into the utility pole.

25   UMF No. 35.  After she crashed and made the U-turn across Eighth Street, Ms. Sharpe drove west

26   in Officer Selland's direction.  UMF No. 39.  Officer Selland shot twice as Ms. Sharpe drove in

27   his direction and then fired a third shot as she passed him.  UMF No. 42; Selland Dep. 23–22:12.

28   He estimates about two seconds passed between the time he saw the car moving in his direction

7

1   and the time he fired his first shot.  Selland Dep. 20:19–22.  As Ms. Sharpe passed Officer

2   Selland on his left she ran into the small tree with her car, breaking the tree in half.  UMF No. 43.

3   As she passed, the Honda hit Officer Selland's open door and came within "inches to a foot" of

4   Officer Selland himself.  Selland Dep. 19:7–18.  The tree landed "right behind [] or almost right

5   on []" Officer Selland.  Selland Interview at 12:19–25.

6          The parties dispute whether Officer Selland believed he had time to move out of

7   the way when Ms. Sharpe came toward him.  *Compare* Selland Dep. 16:16–22 *with* Selland Dep.

8   19:19–22.  The officers cite to Officer Selland's deposition, at which he testified he did not

9   believe he had time to move out of the way and believed Ms. Sharpe was intentionally turning in

10  his direction.  Selland Dep. 16:16–22.  Ms. Losee cites to other parts of his deposition testimony,

11  in which Officer Selland explained by the time he fired his first shot, Ms. Sharpe was

12  approximately thirty feet away.  Selland Dep. 19:19–22.

13         D.     Officer Vega Arrives

14         Officer Vega was in his office when he heard the dispatch call, and he arrived to

15  observe Ms. Sharpe making the U-turn across East Eighth Street after hitting the utility pole.

16  UMF No. 49.  When he arrived, he parked just behind and to the right of Officer Selland's car, in

17  the middle of East Eighth Street.  Vega Interview 15:1–2, Defs.' Ex. B, ECF No. 17-3.  As he

18  exited his car to stand near the driver's side door, Officer Vega heard gun shots, but did not know

19  who was shooting. Vega Interview 15:1–5; PUMF No. 151.

20          While the Honda was heading west on East Eighth Street, Officer Vega also heard

21  its "loud engine." Vega Dep. 27:9–11.  Officer Vega fired one shot through the Honda's front

22  windshield as Ms. Sharpe headed west in his general direction and then fired five or six additional

23  shots as Ms. Sharpe passed him.  UMF No. 53.  Officer Vega estimates he fired all of his shots

24  within approximately fifteen seconds.  Vega Dep. 56:6–8.  Officer Vega said he shot because he

25  thought he was going to get hit by Ms. Sharpe's car and was trying to stop Ms. Sharpe.  Vega

26  Interview 17:1–8; 17:22–33.  He believes he was ten to fifteen feet away from her car when he

27  fired his first shot.  Vega Interview 13:1–5.

28

8

1    E.    Officer Cumber Responds

2         Officer Cumber and his partner were working on paperwork at the Chico City

3    Police Department when they heard the reports of Ms. Sharpe's car failing to yield to Officer

4    Marshall.  Cumber Interview 7:22–25.  Officer Cumber responded and when he arrived, pulled

5    into the apartment complex on Vista Verde Avenue and activated his emergency lights.  UMF

6    No. 57.

7         Officer Cumber arrived as Ms. Sharpe drove along Vista Verde Avenue to return

8    to East Eighth Street, and before she hit the utility pole.  UMF No. 58.  Officer Cumber turned his

9    car around and drove onto East Eighth Street, where he saw Ms. Sharpe make the U-turn, drive

10   onto the road Cumber testified was "blocked with patrol cars," drive over a curb and into the tree,

11   hit Officer Selland's car, slightly miss hitting Officer Vega, and come back into the road.  UMF

12   Nos. 62–63; Cumber Dep. 26:18–20.

13        Officer Cumber then saw Ms. Sharpe head in the direction of another patrol car

14   parked in the street, and he saw an officer's leg extend out of the car, but did not know who the

15   officer was.  Cumber Dep. 31:12–33:13.  The officer in fact was David Quigley, as discussed in

16   more detail below.  Officer Cumber fired one shot at Ms. Sharpe through her driver's side

17   window because she was driving straight toward Officer Quigley.  Cumber Dep. 21:1–3.

18   Immediately before he shot, Officer Cumber estimated Officer Quigley was fifteen to thirty feet

19   from the Honda.  Cumber Dep. 13:17–22.  Officer Cumber was between five and fifteen feet from

20   the Honda at the time he shot.  PUMF 171.[2]  Officer Cumber then saw Ms. Sharpe's car hit

21   Officer Quigley's car on the driver's side.  UMF No. 66.  Officer Cumber observed that Officer

22   Quigley was never struck by the Honda.  Cumber Dep. 16:4–6.

23    F.    Officer Quigley Last to Arrive

24        Officer Quigley was at the Chico Police Department when he heard about the

25   chase.  Quigley Interview 9:10–16.  He responded to the area with lights and sirens blazing.

26   ────────────────

27        [2] The officers object to this statement, as well as PUMF Nos. 151, 168, 176, 179, and 182
     on grounds of relevancy.  ECF No. 26–16.  As stated above, relevancy objections are overruled as
     redundant because the court only considers relevant evidence.  *Burch*, 433 F. Supp. 2d at 1119.

28

9

1  UMF No. 69.  Officer Quigley heard gunshots after arriving on the scene, before he parked his

2  police car near the south side of East Eighth Street close to the entrance of Vista Verde Avenue.

3  Quigley Dep. 27:16–17; PUMF No. 182.  He continued to hear gunshots as he exited his car.

4  PUMF No. 182.

5            When Officer Quigley arrived, Ms. Sharpe had just made the U-turn after hitting

6  the utility pole; she then drove generally in his direction.  UMF No. 72.  During his deposition,

7  Officer Quigley testified the Honda's engine "revved up" as it came towards him.  Quigley Dep.

8  49:14–15.  He immediately began running toward the front of his car to get out of the way.  UMF

9  No. 73.  Officer Quigley fired three shots at the Honda, and testified he narrowly escaped being

10 hit by Ms. Sharpe.  Quigley Interview 10:4–10.  At his deposition, Office Quigley testified he

11 heard two to five rounds of shots before he fired his first shot, but he did not know who was

12 firing.  PUMF No. 169.  Ms. Losee disputes Officer Quigley's narrative and points to evidence

13 suggesting when Officer Quigley fired his first shot, approximately one car's length separated

14 him from the Honda, and the closest the Honda ever came to Officer Quigley was ten or fifteen

15 feet.  Quigley Depo. 40:25–42:2; 42:8–17.  Ms. Sharpe struck Officer Quigley's car after he fired.

16 Quigley Dep. 44:18–20.  The Honda slowed down and stopped as it slid along the side of Officer

17 Quigley's car.  UMF No. 75.

18        G.      Medical Aid Rendered to Ms. Sharpe

19            After the Honda came to a stop, not knowing who was in the vehicle, Sergeant

20 Zuschin retrieved a protective shield and formulated a plan to group the officers together in a safe

21 way to approach the Honda.  UMF No. 76; Zuschin Dep. 60:11–25.  At about the same time he

22 approached the vehicle, Sergeant Zuschin notified dispatch to acquire medical assistance.

23 Zuschin Dep. 10:8–10.  Emergency Medical Technician (EMT) James Dimmitt arrived and stood

24 adjacent to the Honda just as the officers removed Ms. Sharpe from her car; once she was

25 removed, Dimmitt did a head-to-toe search for wounds.  Dimmitt Decl. ¶ 5, ECF No. 17–15.  As

26 he did his search, Mr. Dimmitt noticed Ms. Sharpe stopped breathing, and he attempted to revive

27

28

Ms. Sharpe by performing CPR. *Id.*; UMF Nos. 78, 80. Ms. Sharpe ultimately died from gunshot wounds. PUMF Nos. 196, 197.[3]

### H.   Speed of Ms. Sharpe's Car During Incident and Seizure

As noted above, the total distance between the point where Officer Marshall attempted to initiate the traffic stop and the end of the officers' attempt to stop Ms. Sharpe on East Eighth Street is approximately 1.6 miles. UMF No. 17. The parties dispute how fast Ms. Sharpe was driving during this time. Defendants cite to Officer Marshall's declaration, which states Ms. Sharpe drove fifty miles per hour on East Eighth Street while attempting to evade him, and then lowered her speed to forty miles per hour when she drove south onto Vista Verde Avenue. Marshall Decl. ¶¶ 7, 9. Although Ms. Losee does not dispute Ms. Sharpe was driving fifty miles per hour shortly after Officer Marshall first flashed his lights, Ms. Losee points to deposition testimony suggesting Ms. Sharpe was driving fifteen miles per hour on Vista Verde Avenue. Cumber Dep. 18:14–17. The parties have not cited evidence of Ms. Sharpe's speed when she returned back to East Eighth Street after driving west on Vista Verde Avenue. *See* Defoe Dep. 28:16–18; PUMF No. 176; Zuschin Dep. 54:15–17; Selland Dep. 16:1–7; Vega Dep. 70:9–12; Cumber Dep. 14:1–4; Quigley Dep. 30:22–25. Similarly, no expert testimony analyzes Ms. Sharpe's speed. Whatever the speed, both parties agreed at hearing the officers attempted to seize Ms. Sharpe's car by firing shots at her, and were successful in their efforts when the Honda stopped near Officer Quigley's car.

### III.   LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

---

[3] The officers object to PUMF 197 on the basis of relevancy, lack of foundation, and improper expert opinion, but do not give any reasons supporting their objections. *See* ECF No. 26-16 at 3–4. The objections are overruled.

1    Rule 56 also authorizes granting summary judgment on part of a claim or defense,

2  known as partial summary judgment.  *See* Fed. R. Civ. P. 56(a) ("A party may move for summary

3  judgment, identifying each claim or defense—or the part of each claim or defense—on which

4  summary judgment is sought.").  The standard that applies to a motion for partial summary

5  judgment is the same as that which applies to a motion for summary judgment.  *See State of Cal.*

6  *ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998)

7  (applying summary judgment standard to motion for summary adjudication); *ARC of Cal. v.*

8  *Douglas*, No. 11–02545, 2015 WL 631426, at *3 (E.D. Cal. Feb. 13, 2015).

9    The moving party bears the initial burden of showing the district court "that there

10  is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*,

11  477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish

12  that there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio*

13  *Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular

14  parts of materials in the record . . . or show [] that the materials cited do not establish the absence

15  or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

16  support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The

17  nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

18  material facts.").  Moreover, "the requirement is that there be no genuine issue of material fact . . .

19  Only disputes over facts that might affect the outcome of the suit under the governing law will

20  properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 247–48.  A district

21  court is "not required to comb the record to find some reason to deny a motion for summary

22  judgment."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal

23  quotations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to

24  find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587

25  (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

26

27

28

12

1    IV.    DISCUSSION

2           A.    Federal Claims

3                  1.    Unreasonable Search and Seizure—Excessive Force (Fourth Amendment)

4                  At hearing, the parties agreed Ms. Losee was "seized" when her car stopped by

5    Officer Quigley's car at the end of the 1.6 mile chase.  The officers argue it is "abundantly clear"

6    the amount of force used in effectuating Ms. Sharpe's seizure was objectively reasonable as a

7    matter of law.  Mot. at 24–25.  Ms. Losee argues it was not objectively reasonable for the officers

8    to shoot at Ms. Sharpe given the facts of this case.  Opp'n at 18.

9                  The Fourth Amendment allows police officers to use only objectively reasonable

10   force when they conduct searches and seizures.  *See Green v. City & Cty. of S.F.*, 751 F.3d 1039,

11   1049 (9th Cir. 2014).  Plaintiff's excessive force claim is governed by the reasonableness analysis

12   set forth in *Graham v. Connor*, 490 U.S. 386, 396 (1989).   Under this analysis, the court balances

13   the "nature and quality of the intrusion on the individual's Fourth Amendment interests against

14   the importance of the governmental interests alleged to justify the intrusion."  *Scott v. Harris*,

15   550 U.S. 372, 383 (2007).  In striking this balance, the court pays "careful attention to the facts

16   and circumstances of each particular case" while considering the following factors (1) the

17   "severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of

18   the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to

19   evade arrest by flight."  *Graham*, 490 U.S. at 396.  Because this inquiry is inherently fact specific,

20   the "determination whether the force used to effect an arrest [or seizure] was reasonable under the

21   Fourth Amendment should only be taken from the jury in rare cases."  *Green*, 751 F.3d at 1049

22   (reviewing case based on investigatory stop; quoting *Headwaters Forest Def. v. Cty. of Humboldt*,

23   240 F.3d 1185, 1205–06 (9th Cir. 2000)).

24                  The "'reasonableness' of a particular use of force must be judged from the

25   perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

26   *Graham*, 490 U.S. at 396.  Further, "the calculus of reasonableness must embody allowance for

27   the fact that police officers are often forced to make split-second judgments in circumstances that

28   are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a

13

1    particular situation." *Id.* at 396–97.   Therefore, courts "are free to consider issues outside the

2    three enumerated [in *Graham*] when additional facts are necessary to account for the totality of

3    circumstances in a given case." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir.

4    2015).

5            The Supreme Court has held that an officer can take actions that place a fleeing

6    motorist at risk of serious injury or death in order to stop the flight from endangering the lives of

7    innocent bystanders as well as officers involved in the chase. *Scott*, 550 U.S at 383–84.  In *Scott*,

8    the officer terminated a high speed car chase by applying his push bumper to the rear of the

9    plaintiff's car, causing the plaintiff's car to leave the road and crash. *Id.* at 372.  The Court held

10    the officer's application of force was not excessive where the plaintiff had "swerve[d] around

11    more than a dozen other cars, cross[ed] the double-yellow line, and force[d] cars traveling in both

12    directions to their respective shoulders to avoid being hit." *Id.* at 379.  Additionally, the

13    plaintiff's car "r[a]n multiple red lights," which constituted conduct that was "[f]ar from being

14    cautious and controlled." *Id*. 379–380.  The Court held the plaintiff's conduct "plac[ed] police

15    officers and innocent bystanders alike at great risk of serious injury." *Id*. at 380.  Even when

16    construing the facts in favor of the non-moving party, the Court held no reasonable jury could

17    conclude the plaintiff did not "pose[]a substantial and immediate risk of serious physical injury to

18    others." *Id*. at 387.

19            In *Plumhoff v. Rickard*, the Court reaffirmed the principles articulated in *Scott* by

20    holding an officer acted reasonably when he fatally shot a fugitive who was "intent on resuming"

21    a chase that "pose[d] a deadly threat for others on the road." 572 U.S. __, 134 S. Ct. 2012, 2022

22    (2014).  Additionally, after the Court held qualified immunity applied to an officer who shot and

23    killed an intoxicated fugitive during a high speed car chase in *Mullenix v. Luna*, it noted it has

24    never found the use of deadly force in connection with a dangerous car chase to violate the Fourth

25    Amendment.  ___U.S.___ ,136 S. Ct. 305, 310 (2015).

26            With these standards in mind, the court turns to the merits of Ms. Losee's

27    excessive force claim, applying the factors set out in *Graham*.

28

1          a)      Severity of Crime at Issue

2          Here, the officers argue the crime they were responding to arose from a "reckless

3    driving and felony evading scenario." Mot. at 25.  Plaintiff argues the crime was merely driving

4    with a broken taillight, and therefore was not serious.  Opp'n at 22.

5          Construing all the evidence in favor of Ms. Losee, as well as drawing reasonable

6    inferences in her favor, the court concludes a reasonable jury could conclude only that the

7    incident at the heart of Ms. Losee's excessive force claim was Ms. Sharpe's reckless driving after

8    she failed to stop for Officer Marshall.  Ms. Sharpe's encounter with the officers did not arise

9    merely from a broken taillight or Ms. Sharpe's simple refusal to yield to Officer Marshall's

10   flashing lights, but to the chase that ensued shortly after Officer Marshall responded to the scene.

11   Ms. Sharpe's reckless driving indisputably damaged public property, including a tree, a utility

12   pole, and two police cars; it also threatened the bodily safety of five officers.  This factor favors

13   the officers.

14          b)      Threat to Safety

15          The officers argue Ms. Sharpe posed a danger to the public in general and other

16   officers in particular by recklessly fleeing in her car. Mot. at 25.  Ms. Losee argues Ms. Sharpe's

17   vehicle did not pose an immediate threat to the safety of officers or others.  Opp'n at 25.

18          Construing all evidence and drawing all reasonable inferences in Ms. Losee's

19   favor, the court holds no reasonable jury could conclude Ms. Sharpe did not pose a threat to the

20   safety of the officers at least.  After Officer Marshall flashed his lights at Ms. Sharpe, she refused

21   to stop, and instead gave chase in such a manner that at one point she "appeared airborne," drove

22   on the wrong side of the road, did not slow down for speedbumps, ignored stop signs, and crashed

23   into a utility pole. UMF Nos. 9, 11, 21, 26.  After responding to reports over dispatch, each

24   defendant officer arrived on the scene in time to witness Ms. Sharpe swerve into a U-turn, miss

25   hitting Officer Selland by "inches to a foot," crash into a tree so as to break it in half, and drive in

26   the direction of multiple officers, all within 1.6 miles.  UMF Nos. 31, 39, 43, 48, 72; Selland Dep.

27   16:16–22, 19:7–18.  While the number of officers outnumbered Ms. Sharpe, the number

28   responding was not unreasonable under the circumstances.  Ms. Sharpe's remaining in her vehicle

1    and deploying it as a deadly weapon in the course of attempting an escape created a threat to the

2    officers, particularly once they exited their vehicles.  No reasonable jury could conclude the

3    officers' fear of danger to themselves and their colleagues was unreasonable.

4              While Ms. Losee points to evidence showing there were approximately ten to

5    twenty feet between Ms. Sharpe and the officers at the time each of them fired their guns, PUMF

6    No. 110; Opp'n at 25, Ms. Losee effectively asks the court to narrow each officer's shot to the

7    exact circumstances occurring seconds before the shot was fired.  This narrow focus misconstrues

8    the teaching of *Graham*, which requires consideration of the "totality of the circumstances."

9    *Graham*, 490 U.S. at 396–97. Considering all that transpired before any shots were fired, and that

10   Ms. Sharpe continued to drive recklessly despite encountering a road blocked with patrol cars and

11   after shots were fired to stop her, the officers had reason to believe Ms. Sharpe's reckless driving

12   posed a threat to them or others around them.  This factor also favors the officers.

13              c)      Active Resistance

14              It is not disputed Ms. Sharpe engaged in active resistance.  *See* Mot. at 26; Opp'n

15   at 20.  From the point Ms. Sharpe declined to yield to Officer Marshall's flashing lights, to the

16   time she hit Officer Quigley's car before coming to a complete stop, Ms. Sharpe actively resisted

17   at least one order to yield before swerving around several police cars blockading her movement

18   on East Eighth Street, hitting at least two cars in the process.  This factor favors the officers as

19   well.

20              d)      Least Intrusive Means

21              Ms. Losee argues at the time each officer was about to shoot at Ms. Sharpe, he had

22   time to move out of the way and should have done so.  Opp'n at 7.  But this argument lacks merit,

23   for officers are not required to find and choose the least intrusive alternative to remedy a situation

24   involving a reckless car chase.  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  As the Ninth

25   Circuit has observed,

26              [r]equiring officers to find and choose the least intrusive alternative
              would require them to exercise superhuman judgment.  In the heat
27              of battle with lives potentially in the balance, an officer would not
              be able to rely on training and common sense to decide what would
28              best accomplish his mission.  Instead, he would need to ascertain

> the least intrusive alternative (an inherently subjective determination) and choose that option and that option only. Imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves. It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment. Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.

*Id.* Here, it was entirely reasonable for the officers to conclude Ms. Sharpe endangered them and their colleagues with her conduct. As the Supreme Court has held, "police officers are justified in firing at a suspect to end a severe threat to public safety, [and] the officers need not stop shooting until the threat has ended." *Plumhoff*, 134 S.Ct at 2022.

    e)  Summary

   Here, the undisputed material facts demonstrate the officers were reasonable in their belief that Ms. Sharpe's reckless driving posed a threat to them, each other, or the public. As a matter of law, no reasonable jury could conclude the officers acted unreasonably.

   Summary judgment is GRANTED as to Ms. Losee's Fourth Amendment claim. Because the court concludes no violation arose from the officers' force used to terminate the car chase, the officers' motion for summary judgment on grounds of qualified immunity is GRANTED without further analysis. *Hopkins v. Bonvicino*, 573 F.3d 752, 762 (9th Cir. 2009) ("If the alleged conduct did not violate a constitutional right, then the Defendants are entitled to immunity and the claim must be dismissed.").

    2.  Substantive Due Process

   The officers contend the evidence in the record does not support a jury finding for Ms. Losee on her substantive due process claim of interference with familial relationship. Mot. at 33. Ms. Losee contends the facts could support a jury's finding a substantive due process violation. Opp'n at 29.

   It is well established that a parent has a "fundamental liberty interest" in "the companionship and society of his or her child" and that "[t]he state's interference with that liberty

1    interest without due process of law is remediable under [42 U.S.C. §] 1983." *Kelson v. City of*

2    *Springfield*, 767 F.2d 651, 654–55 (9th Cir. 1985).

3             To establish a constitutional substance due process violation as alleged here, the

4    officers' conduct must "shock[] the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir.

5    2008).  In determining whether excessive force shocks the conscience, the first inquiry is

6    "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id.*

7    (citing *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (internal

8    quotation marks omitted)).

9             Where actual deliberation is practical, an officer's "deliberate indifference" may

10   suffice to shock the conscience.  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

11   The deliberate indifference standard requires that "a person  . . . 'consciously disregar[d]' a

12   substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).  On the other

13   hand, where a law enforcement officer makes a snap judgment in an escalating situation, "h[er]

14   conduct may only be found to shock the conscience if [s]he acts with a purpose to harm unrelated

15   to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554.  Under the purpose or

16   intent to harm standard, the court looks at the totality of the circumstances to assess whether a

17   jury could reasonably infer any of the officers were acting for purposes other than legitimate law

18   enforcement.  *Porter*, 546 F.3d at 1141.

19            *Porter* is illustrative here.  In that case, an officer received a call regarding a

20   suspicious car in a lightly populated part of town at two in the morning.  *Id.* at 1133.  When an

21   officer arrived at the scene and found the car, he initially found it abandoned.  *Id*.  While the

22   officer was investigating the vehicle from inside his police car, the decedent sat up, grabbed the

23   steering wheel, and slowly steered his car around the officer's patrol vehicle.  *Id.* at 1134.  After

24   decedent failed to adhere to the officer's several orders to stop, the officer got out of his car and

25   began walking alongside the decedent's car, again ordering him to stop.  *Id.*  By this time, another

26   officer had arrived, and both officers ordered the decedent to get out of the car.  *Id.*  After the

27   officers used pepper spray in an effort to draw the decedent from his car, the decedent again

28   grabbed the steering wheel, "revved" the engine, and started to drive toward one of the officers.

18

1    *Id.* at 1135.  The officer who was not in the way of the decedent's car saw this and fired his

2    weapon until the car stopped.  Later it was determined the decedent had died.  *Id.*  at 1132.  The

3    entire incident occurred within a span of five minutes.  *Id.* at 1139.  In his deposition, the officer

4    who stood in the way of the decedent's car said he did not feel any danger to himself.  *Id.* at 1135.

5    Additionally, the record indicated the decedent was not driving very fast.  *Id.* at 1137 n.3.  At his

6    deposition, in fact, the officer in the way of decedent's car said the car was driving no more than

7    five to ten miles per hour.  *Id.*

8           The decedent's family brought suit against the officer who fired the gun,

9    contending he violated their Fourteenth Amendment due process right to associate with their son.

10   *Id.* at 1136.  The district court denied the shooting officer's motion for summary judgment,

11   holding the deliberate indifference standard applied and sufficient disputed material evidence

12   warranted a jury trial.  *Id.* at 1133.  The Ninth Circuit concluded the "purpose to harm standard"

13   applied because of the "evolving set of circumstances that took place over a short period

14   necessitating 'fast action.'"  *Id.* at 1139.  Because the entire altercation was only five minutes

15   long, the court concluded the defendant officer faced a situation that was "obviously fast paced"

16   and "much shorter in duration than the typical car chase" reviewed in prior cases. *Id.* (discussing

17   *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) and *Bingue v. Prunchak*, 512 F.3d 1169,

18   1176 (9th Cir. 2008)).

19          The five minute altercation, although literally compatible with deliberation,

20   presented a situation in "constant flux, with much yelling, confusion, and a driver who was

21   refusing to exit or stop his car."  *Id.* at 1140.  The situation was thereby "quickly evolving and

22   escalating, prompting repeated split second decisions."  *Id.* at 1139.  The Circuit found "purpose

23   to harm" was the correct standard to apply in *Porter*.  *Id.*  The case was remanded to determine

24   whether the shooting officer's conduct satisfied the correct standard.  *Id.* at 1142.

25          Here, in construing the evidence and drawing all reasonable inferences in

26   Ms. Losee's favor, the court holds a reasonable jury could only conclude actual deliberation was

27   not practicable under the circumstances of this case.  Even assuming Ms. Sharpe was going no

28   more than fifteen miles an hour for part of the chase when driving on Vista Verde Avenue, the

1   officers experienced a *Porter*-like "fast paced" situation in which one or more of them witnessed

2   the Honda airborne, the Honda crashing into a utility pole, the same Honda crashing into a tree

3   and breaking it in half, and then crashing into more than one patrol car, with gunshots at intervals.

4   All of this occurring within a short time span would not have realistically given any officer time

5   to deliberate whether to use less intrusive or violent means to abate the threat Ms. Sharpe posed.

6   As in *Porter*, the situation facing the officers necessitated "fast action." *Id.* at 1139.  The purpose

7   to harm standard applies here.

8           Because the purpose to harm standard applies, the court assesses whether under the

9   totality of the circumstances a jury could reasonably find any one of the officers was acting for

10   purposes other than legitimate law enforcement.  Given the facts of this case, the court need not

11   analyze the officers' actions individually, one by one; at the time each officer shot, Ms. Sharpe

12   posed a danger to at least one of them, and at times to all of them and their colleagues.  In light of

13   the circumstances, no reasonable jury could conclude any officers' intent in shooting at

14   Ms. Sharpe was to "teach [Ms. Sharpe] a lesson" or to "get even." *Id.* at 1140–41.

15           The officers' motion is GRANTED as to Ms. Losee's substantive due process

16   claim.

17       B.       State Claims

18           The officers contend Ms. Losee also cannot withstand summary judgment on her

19   claims for state law battery, negligence, or the Bane Act.  Mot. at 37.  Ms. Losee contends she has

20   the right to a jury's determination of these claims because she has established her case is triable

21   on her excessive force claim.  Opp'n at 31.

22           1.       Battery Standards

23           To establish a claim for battery under California law, a plaintiff must show

24   (1) defendant intentionally did an act resulting in a harmful or offensive contact with the

25   plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive

26   contact caused injury, damage, loss, or harm to plaintiff.  *Piedra v. Dugan*, 123 Cal. App. 4th

27   1483, 1495 (2004).  As with a Fourth Amendment excessive force claim, a prima facie battery is

28

                                                    20

1    not established unless and until plaintiff proves unreasonable force was used.  *Edson v. City of*

2    *Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998).

3                        2.        Negligence Standards

4                   As to negligence, a plaintiff must show that [the] defendant had a duty to use due

5    care, that he breached that duty, and that the breach was the proximate or legal cause of the

6    resulting injury.  *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013).  Duty is a critical

7    element of negligence liability.  *Id.*  California courts have long recognized that peace officers

8    have a duty to act reasonably when using deadly force.  *Id.*

9                   To determine reasonableness, state negligence law, like the Fourth Amendment

10   reasonableness test, requires a consideration of the totality of the circumstances surrounding any

11   use of deadly force.  *Id.*  The totality of the circumstances, including the pre-shooting conduct of

12   the officers, might persuade a jury to find the shooting negligent, because such conduct might

13   show that an otherwise apparently reasonable use of deadly force was in fact unreasonable.  *Id.*

14   Where, as here, plaintiff has not alleged a separate injury from the pre-shooting conduct of law

15   enforcement personnel, the pre-shooting conduct is relevant only to the extent it shows, as part of

16   the totality of circumstances, that the shooting itself was negligent.  *Id.* at 631.

17                        3.        Bane Act Standards

18                   The Bane Act prohibits any person from interfering by "threat[s], intimidation or

19   coercion . . . with the exercise or enjoyment by any individual . . . of rights secured by the

20   Constitution . . . ."  Cal. Civ. Code § 52.1(a).  Section 52.1 claims differ from § 1983 claims in

21   that section 52.1 also requires independent evidence of threats, intimidation, or coercion.  *See*

22   *Malott v. Placer Cty.*, No. 14–1040, 2016 WL 538462, at *7 (E.D. Cal. Feb. 11, 2016).  In

23   evaluating the threatening or coercive conduct, the court must consider whether "a reasonable

24   person, standing in the shoes of the plaintiff, [would] have been intimidated by the actions of the

25   defendant and have perceived a threat of violence."  *Winarto v. Toshiba Am. Elecs. Components,*

26   *Inc.*, 274 F.3d 1276, 1289–90 (9th Cir. 2001).  A plaintiff cannot attempt to satisfy two distinct

27   elements by establishing only one, e.g., an unlawful or unconstitutional act.  *Malott*, 2016 WL

28   538462, at *7.

21

1        4.      Analysis

2        As in the case of the court's Fourth Amendment reasonableness analysis,

3 construing the evidence in a light most favorable to Ms. Losee, a reasonable jury could not

4 conclude the officers' acts were unreasonable.  As explained above, Ms. Sharpe's reckless

5 driving, which included at least two crashes within a 1.6 mile distance, was a threat to the safety

6 of officers or others.  The officers' summary judgment motion on Ms. Losee's battery claim is

7 GRANTED.  In the same vein, the evidence does not show the officers breached their duty of

8 reasonableness.  The officers' motion on Ms. Losee's negligence claim is GRANTED.  Finally,

9 for the same reasons, and also considering the record does not show "independent evidence of

10 threats, intimidation, or coercion," the officers' motion on Ms. Losee's Bane Act claim is

11 GRANTED.  *Malott*, 2016 WL 538462, at *7.  In summary, the officers' motion is GRANTED

12 on all of Ms. Losee's state law claims.

13 V.      CONCLUSION

14        For the foregoing reasons, all DOE defendants are DISMISSED.  The following

15 claims also are DISMISSED under Federal Rule of Civil Procedure 41(a)(2): (1) unreasonable

16 search and seizure—detention and arrest; (3) denial of medical care; (5) municipal liability for

17 approving the acts of defendant officers; (6) municipal liability for failure to train; (7) municipal

18 liability for an unconstitutional custom or policy; and (8) false arrest or false imprisonment in

19 violation of California Government Code section 815.2(a)

20        The officers' motion for summary judgment is GRANTED as to the following

21 claims: (2) unreasonable search and seizure—excessive force in violation of the Fourth

22 Amendment; (4) interference with familial relationship; (9) state law battery (10) state law

23 negligence; and (11) violation of the Bane Act.

24        Given that all claims are thus resolved, this case is CLOSED.

25        This order resolves ECF No. 17.

26        IT IS SO ORDERED.

27 DATED:  July 29, 2016.

28                                                      _____
                                                    UNITED STATES DISTRICT JUDGE